**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DANY MERCADO, as Legal Guardian of, S.S.M., a minor,** | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| v. | : | |
| | : | **NO. 25-5925** |
| **ROBLOX CORPORATION, EPIC GAMES, INC., MICROSOFT CORPORATION, and MOJANG AB,** | : | |
| Defendants. | : | |

**Perez, J.** **September 25, 2026**

**MEMORANDUM**

This case arises from minor S.S.M.'s use of and resulting addiction to video games created by Defendants Epic Games, Inc. ("Epic"), Roblox Corporation ("Roblox"), and Mojang AB ("Mojang"), all of which may be played on Defendant Microsoft Corporation's ("Microsoft") Xbox gaming system. Players cannot play these games without first creating accounts and accepting Defendants' user agreements. Those user agreements all contain arbitration provisions. Before the Court is Epic's motion to compel arbitration, which Epic supports with a declaration from its director of product management. Plaintiff has filed fourteen objections to the declaration and supporting exhibits. The Court sustains a number of the objections and strikes certain paragraphs and exhibits, including those purporting to show how the Fortnite End User License Agreement (EULA) is shown on the user's screen when requiring acceptance and business records for which an inadequate foundation was laid.

For an electronic agreement to be enforceable, the consumer must have adequate notice of the agreement, meaning the agreement must be conspicuous. Without knowing how the EULA was presented to the consumer on the computer or console screen at the relevant time, the Court cannot

determine whether the creators or users of S.S.M.'s Epic accounts were on notice of the EULA. Epic's motion must, therefore, be denied at this stage. Moreover, even if Epic's systems provided adequate notice, minors are generally considered incompetent to contract, so the law allows them to disaffirm agreements they entered. S.S.M. disaffirmed the EULA on June 3, 2026, and, specifically, its provision that would otherwise require an arbitrator to decide the EULA's enforceability. Epic has produced no evidence showing this disaffirmance was ineffective. For these reasons and the reasons discussed more fully herein, Epic's motion to compel S.S.M. to arbitrate their claims is denied.

## I. Background

Epic developed, markets, and sells the video game Fortnite, which is available to play on Microsoft Xbox, Sony PlayStation, Nintendo Switch, and personal computers and mobile devices. Compl. ¶ 18, ECF No. 1; Saunders Decl., ECF No. 51-2 ¶¶ 2, 4. Plaintiff S.S.M. began playing video games at approximately six years old and began playing Fortnite at age 9. ECF No. 1 ¶¶ 13, 282. Now a teenager, S.S.M. alleges they are addicted to video games because of their use of Defendants' games, including Fortnite. *Id.* ¶ 280. This addiction has caused S.S.M. to spend the majority of their time outside of school playing video games and has caused a decline in S.S.M.'s academic performance and diminishing social interactions. *Id.* ¶¶ 290–92. S.S.M. suffers from severe withdrawal symptoms if anyone attempts to remove them from video games. *Id.* ¶ 294.

On October 15, 2025, S.S.M. brought this lawsuit, raising claims of, *inter alia*, strict product liability, negligence, and fraud against each Defendant. On December 3, 2025, the parties entered a stipulation setting a deadline for all Defendants to file motions to compel arbitration by February 27, 2026. ECF No. 32. The Court approved the stipulation on the same day. ECF No. 34. Epic timely moved to compel S.S.M. to arbitrate their claims against Epic. ECF No. 51 (Epic's Motion). Plaintiff filed an opposition and objected to the Declaration of David Saunders and

exhibits attached thereto. The motion and objections have been fully briefed and are ripe for review.

Before playing Fortnite, players must create an Epic account. Saunders Decl., ECF No. 51-2 ¶¶ 32–33. To set up an Epic account, players must enter their date of birth, their country, email address, and first and last names, and then choose a unique display name and password. ECF No. 51-2 ¶¶ 9, 23–24. Before a player may submit the information and complete the account creation process, they must check a box indicating they have agreed to Epic's terms of service and click "Continue."[1] *Id.* ¶¶ 10–11.

After creating an Epic Games account and downloading the Fortnite software, players must log into their account using their unique username and password and accept the EULA. *Id.* ¶¶ 32–34.[2] Players can click "accept" or "decline," but they cannot continue to play Fortnite without accepting the EULA's terms. *Id.* ¶¶ 33–34.

The first page of the EULA states:

> You and Epic agree to resolve disputes between us in individual arbitration (not in court). We believe the alternative dispute-resolution process of arbitration will resolve any dispute fairly and more quickly and efficiently than formal court litigation. Section 12 explains the process in detail. We've put this up front (and in caps) because it's important:
>
> **THIS AGREEMENT CONTAINS A BINDING, INDIVIDUAL ARBITRATION AND CLASS-ACTION WAIVER PROVISION. IF YOU ACCEPT THIS AGREEMENT, YOU AND EPIC AGREE TO RESOLVE DISPUTES IN BINDING, INDIVIDUAL ARBITRATION AND GIVE UP THE RIGHT TO GO TO COURT . . . .**

ECF No. 51-16 at 2 (version of EULA effective when Accounts #2, 3, and 4 were created); ECF No. 51-2 ¶¶ 61, 70, 73. Then, beginning on page 10 at Section 12, the EULA provides more detail,

---

[1] Epic's terms of service do not form the basis of the motion to compel arbitration.

[2] Effective November 28, 2025, players have been required to agree to Epic's Terms of Service instead, but there is no evidence those terms were accepted by a user of the S.S.M. Epic accounts. ECF No. 51-2 ¶ 32.

including that the parties agree to submit all disputes to arbitration, including those related to "the validity, enforceability, or scope of this Binding Individual Arbitration section." EULA §§ 12.3–12.3.1, ECF No. 51-16 at 11; ECF No. 51-2 ¶¶ 38, 61, 70, 73. If players want to play Fortnite but not be bound to arbitrate, the EULA allows a time-limited right to opt out of the arbitration clause. ECF No. 51-16 at 2 ("You have a time-limited right to opt out of this waiver." (emphasis removed)); *Id.* at 14 § 12.6 (describing procedure to opt out of arbitration provision, requiring user to send written notice to Epic "**within 30 days of the date on which you first accepted this Agreement**" and requiring the notice to "include your name, mailing address, and account name you use while playing Fortnite, and state that you do not wish to resolve disputes with Epic through arbitration"). By its terms, the EULA is subject to the Federal Arbitration Act ("FAA"). *Id.* at 12 § 12.3.

On February 6, 2026, Plaintiff's counsel provided Epic's counsel with information for the accounts S.S.M. uses to play Fortnite, including Gamertags and email addresses. ECF No. 55-1 ¶ 47; *see also* Rickert Decl. Ex. A, ECF No. 51-33. Based on the information provided by Plaintiff, Epic identified six accounts belonging to S.S.M. ECF No. 55-1 ¶ 47. Epic Account #1 was created on March 2, 2019. *Id.* ¶ 47.a. The EULA in effect at that time is attached to the Saunders Declaration as Exhibit 9. *Id.* ¶ 52; ECF No. 51-11. Epic Account #2 was created on August 6, 2019. ECF No. 51-2 ¶ 47.b. Epic Account #3 was created on September 28, 2019. ECF No. 51-2 ¶ 47.c. The EULA in effect at that time is attached to the Saunders Declaration as Exhibit 14. *Id.* ¶ 70; ECF No. 51-16. Epic Account #4 was created on January 10, 2021. ECF No. 51-2 ¶ 47.d. The EULA in effect at that time is attached to the Saunders Declaration as Exhibit 14. *Id.* ¶ 73; ECF No. 51-16. Epic Account #5 was created on November 5, 2021. *Id.* ¶ 47.e. The EULA in effect at that time is attached to the Saunders Declaration as Exhibit 21. *Id.* ¶ 76; ECF No. 51-23. Epic

Account #6 was created on August 13, 2024. ECF No. 51-2 ¶ 47.f. The EULA in effect at that time is attached to the Saunders Declaration as Exhibit 27. *Id.* ¶ 90; ECF No. 51-29.

Saunders also attests that "Epic maintains electronic records of each instance in which a player accepts the EULA. ECF No. 51-2 ¶ 50. Relying on those records, Saunders avers that the user of each account subsequently accepted the EULA as updates became available, identifying the dates, times, and devices on which this acceptance occurred. *Id.* ¶¶ 50, 51, 53, 55, 57, 59, 60, 62, 64, 66, 68, 69, 71, 72, 74, 75, 77, 79, 81, 83, 85; *see also* Ex. 8, ECF No 55-5; Ex. 13, ECF No. 55-6; Ex. 18, ECF No. 55-7; Ex. 19, ECF No. 55-8; Ex. 20, ECF No. 55-9. Saunders does not provide any explanation for when or how those records are made.

S.S.M's grandmother and guardian Dany Mercado has never played Fortnite or created a Fortnite account, nor has she ever seen the EULA. Mercado Decl. ¶¶ 14–15, ECF No. 63-1. S.S.M. does not deny creating the Epic Accounts. *See* S.S.M. Decl., ECF No. 63-2. S.S.M. states that the game saves their username and password and rarely asks for it to be entered before playing. *Id.* ¶ 11. S.S.M. has played Fortnite using multiple accounts and is aware of other people using some of the same accounts. *Id.* ¶ 10. S.S.M. does not recall seeing the EULA or any messages from Epic about arbitration. *Id.* ¶ 12. S.S.M. does not know what "arbitration" means. *Id.* ¶ 13.

On January 14, 2025, Plaintiff's counsel sent a letter to Epic purporting to opt out of the EULA on behalf of Plaintiff and counsel's other clients. ECF Nos. 55-11–55-13 (listing Plaintiff at ECF No. 55-12 at 18). Plaintiff's counsel sent a subsequent letter providing "updated information for certain clients," including Plaintiff. ECF No. 51-2 ¶ 94; ECF No. 55-12.

S.S.M. executed a declaration on June 3, 2026, disaffirming any agreement with Epic, including the EULA. *Id.* ¶ 22.

## II. Plaintiff's Objections

Plaintiff objects to the declaration of David Saunders and the exhibits thereto under Federal Rules of Evidence 402, 403, 602, 701, 802, 803(6), 901, 1002, and 1004. ECF No. 63-6. David Saunders is a director of product management at Epic and has worked for Epic since 2023. ECF No. 51-2 ¶ 1. He avers that he has personal knowledge of the facts presented in his declaration. *Id.* His declaration outlines the process for creating Epic accounts and logging into the Fortnite game. It also attaches images of Epic's account creation process and sign-in screens, account information from Epic's records for S.S.M.'s Epic accounts, copies of the EULA in effect at the time S.S.M.'s Epic accounts were created, and the updates that Saunders states were accepted throughout the years. For each attached exhibit, Saunders attests that it is a "true and accurate copy" of the document. *E.g.*, *id.* ¶¶ 10, 27, 48, 56.

### A. Personal Knowledge

Plaintiff begins with an objection for lack of foundation under Federal Rule of Evidence 602. Plaintiff contends that "reciting one's position or job title is insufficient to demonstrate competence to testify," that there is no basis for Saunders' purported knowledge of the processes in place pre-dating the beginning of his employment in 2023, and that he does not claim to be attesting in the capacity of a custodian of records such that the business records exception to hearsay would negate the need for personal knowledge.

"A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Such evidence may consist of the witness's own testimony. *Id.* "When a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based on the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702." *Donlin v. Philips Lighting N. Am. Corp.*, 581

F.3d 73, 81 (3d Cir. 2009). "When testifying about his business, a lay witness's personal knowledge may include 'inferences that he could draw from his perception of a business's records, or facts or data perceived by him in his corporate capacity.'" *United States v. Eady*, 648 F. App'x 188, 190 (3d Cir. 2016) (quoting *United States v. Polishan*, 336 F.3d 234, 242 (3d Cir. 2003)). In *Eady*, a senior engineer testified about the operation and interface of a web service used for call recording without being qualified as an expert. *Id.* The witness had no prior experience with the service because it was discontinued before he joined the company. *Id.* Nonetheless, the Third Circuit affirmed the allowance of the testimony because, although the testimony was "perhaps at the outer limits of permissible lay witness testimony, his knowledge was nonetheless based on business records and information that he acquired from his professional colleagues." *Id.* Similarly, in *United States v. Bansal*, the Third Circuit found that an IRS agent had sufficient personal knowledge to testify about wire transfers where his testimony was based on his personal examination of the bank and wire transfer records introduced at trial. 663 F.3d 634, 667 (3d Cir. 2011).

Courts in this district have also applied this approach in the context of motions to compel arbitration. *Klosterman v. Discover Prods. Inc.*, 752 F. Supp. 3d 470, 477 (E.D. Pa. 2024) (Beetlestone, J.) (declining to exclude declaration where declarant reviewed plaintiff's account history and records and the accompanying exhibits were admissible business records under Rule 803(6)); *Crumpler v. Midland Credit Mgmt., Inc.*, 2013 WL 6576318, at *2 (E.D. Pa. Dec. 13, 2013) (Rufe, J.) (declining to strike declaration where declarant "reviewed business records before his deposition from which he learned of T-Mobile's business practice to put Terms and Conditions in boxes with phones," which "allow[ed] him to testify to the business practice, which would be sufficient for a factfinder to infer that T-Mobile acted in conformity with the business practice").

This is consistent with the summary judgment standard applicable to a motion to compel arbitration like this one. In moving for or opposing summary judgment, a party may support or oppose a motion with an affidavit or declaration based on personal knowledge from a person competent to testify, where it sets out facts that would be admissible in evidence. Fed. R. Civ. P. 56(c). They may also "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Plaintiff offers no reason to believe Epic would not be able to present the evidence in an admissible form at trial (at least with respect to the declaration as a whole), and Plaintiff acknowledges that "a witness can obtain personal knowledge of events otherwise outside their actual perception and observations through the review of, e.g., business records." ECF No. 79 at 3. However, Plaintiff argues "there must be limits to a declarant's ability to supplement their personal knowledge" when they are not testifying as a corporate designee. ECF No. 79 at 3. Plaintiff cites no case law supporting this proposition or showing the line should be drawn where Plaintiff contends it should be. Saunders attested under penalty of perjury that he has personal knowledge of the facts contained within the declaration, including that each exhibit is a "true and accurate" copy of what it purports to be. This is sufficient to establish that he gained the personal knowledge necessary to testify to the information. Plaintiff's objections under Rule 602 are, therefore, overruled.

**B. Authentication**

Plaintiff also argues that the exhibits are not properly authenticated. Rule 901 allows a party to satisfy the requirement of authenticating evidence through testimony of a witness with knowledge that the item is what it claims to be. Fed. R. Evid. 901(a), (b)(1). The proponent has an "incredibly 'slight' burden, which may be satisfied by simply producing 'evidence sufficient to support a finding that the item is what the proponent claims it is.'" *Blunt v. Lower Merion Sch.*

*Dist.*, 767 F.3d 247, 330 (3d Cir. 2014) (McKee, J., concurring in part) (quoting Fed. R. Evid. 901(a)). Saunders attests that he has personal knowledge and that each exhibit is a "fair and accurate" copy of what it purports to be. This is sufficient. Plaintiff's objections based on authentication are overruled.

**C. Best Evidence**

In Objection Numbers 1 through 6, Plaintiff invokes the Best Evidence Rule. *See* ECF No. 79 at 6, 9, 11, 13, 17, 19. The Best Evidence Rule requires a party to produce the "original writing, recording, or photograph . . . to prove its content." Fed. R. Evid. 1002. With respect to the versions of the EULA, Saunders does so. He attaches each version of the EULA from the time S.S.M.'s first Epic account was created until the most recent accepted update. The Rule does not prohibit the declarant from quoting from the documents that have been produced or explaining their contents.[3] *See Giuliano v. Anchorage Advisors, LLC*, 19 F. Supp. 3d 1087, 1100 (D. Or. 2014) ("Where, as in every instance here, the subject document is in fact offered into evidence, the rule does not preclude testimony regarding its contents, whether or not such testimony would be superfluous."). Nor does it require the production of documents containing information about which the declarant has personal knowledge, unless he is seeking to prove the contents of those documents. *Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1543 (11th Cir. 1994) (Rule 1002 does not "require production of a document simply because the document contains facts that are also testified to by a witness." (citation omitted)).

[3] The Best Evidence Rule would not apply, for example, to Saunders's statements identifying S.S.M.'s Epic Accounts or the history of EULA acceptance on each. The produced records of S.S.M.'s Epic accounts or later acceptances of the EULA updates form the basis for Saunders's knowledge of S.S.M.'s account history, but the declaration does not seek to prove their contents. *See* Fed. R. Evid. 1002, advisory committee's notes ("Application of the rule requires a resolution of the question whether contents are sought to be proved. Thus an event may be proved by nondocumentary evidence, even though a written record of it was made. If, however, the event is sought to be proved by the written record, the rule applies.").

In her first objection, Plaintiff argues generally that "all statements as to the contents of a writing that has not been produced must be stricken" but identifies no specific statement. Nor does Plaintiff identify any document that was not produced. The Court will not guess at which statements Plaintiff believes should be stricken. *See Utica Mut. Ins. Co. v. Munich Reins. Am.*, 2018 WL 3135847, at *9 (N.D.N.Y. June 27, 2018) (denying motion to preclude testimony concerning interpretation of policy where defendant did "not identif[y], with any specificity, the factual evidence or documents it contend[ed] [were] subject to [Rule 1002]").

Plaintiff later argues that the screenshots depicting the account creation process only apply to accounts created after 2022 and "to the extent Mr. Saunders's statements reflect a comparison of Epic's *current* screen flow from the past that he has reviewed, he is offering evidence of the content of a writing (the prior screenflows) that are not in evidence – a clear violation of the best evidence rule." ECF No. 63 at 13 (citing Fed. R. Evid. 1002, 1004). Epic responds that this is demonstrative evidence and that it has filed screenshots of the previous acceptance process in other cases. ECF No. 78 at 4. The Court agrees with Plaintiff that the best evidence of what users saw on their screens at any given time is a screenshot of the screen as it was then, not as it is now. For that reason, the Court will not consider the screenshots depicting the current screenflow process or the descriptions of what was shown on screen.

However, with respect to Saunders's description of the account creation process more generally, Plaintiff is mistaken as to the applicability of the best evidence rule. For instance, Saunders explains that to create an Epic account, the player must provide their date of birth, choose a unique display name and password, and check a box indicating they agree to the "terms of service." ECF No. 51-2 ¶¶ 9–10, 23–24. He further explains that users must log into their Epic Account in the Fortnite game and click "accept" when faced with a scrollable display of the EULA.

*Id.* ¶ 34. These descriptions of the account creation process are based on Saunders's personal knowledge, including his review of Epic's records, about which he may testify. For those descriptions, there is no best evidence violation. *See Swann*, 27 F.3d at 1543.

Plaintiff's objection number 12 challenges the statement that "Epic records reflect that S.S.M. Account #5 has been used to play Fortnite many times since the filing of the Complaint on October 15, 2025, including most recently on November 19, 2025." ECF No. 79 at 34 (quoting ECF No. 51-2 ¶ 87). Epic did not produce those records. Regardless, this statement does not seek to prove the contents of the records. Rather, it seeks to prove that Account #5 was still in use after the Complaint was filed. That is knowledge the declarant gained from review of Epic's records. It is not a Best Evidence violation. *See Swann*, 27 F.3d at 1543.

In sum, Plaintiff's Best Evidence objections to Exhibits 2, 3, and 4 and the declaration's references thereto are sustained. Plaintiff's remaining Best Evidence objections are overruled.

### D. Relevance

Only relevant evidence is admissible. Fed. R. Evid. 402. The test for relevance is a low bar. *Forrest v. Parry*, 930 F.3d 93, 114 (3d Cir. 2019). To be relevant, evidence need only have "*any tendency* to make a fact [of consequence] more or less probable." *Id.*; Fed. R. Evid. 401.

**Epic Games Account Creation Process:** Paragraphs 5 through 22 of the declaration describe the Epic account creation process through Epic Games, as opposed to the account creation process using a video game console like Xbox or PlayStation. Plaintiff argues these steps are not relevant because S.S.M.'s Epic Accounts were created on a Nintendo Switch, PlayStation, and Xbox, so the account creation process through Epic Games is inapplicable to S.S.M.'s accounts. Pl.'s Obj. No. 2, ECF No. 79 at 6–7. The Court disagrees. Paragraphs 5 through 11 describe one way to create an Epic Games Account. The declaration does not establish that the Epic Games

account cannot be created on video game consoles. Rather, it provides two methods of creating an Epic account. Creating a console-linked account is an option for video game console users, but those accounts appear to be limited to the console on which they are created, and there is no indication that the S.S.M. Accounts were so limited. ECF No. 51-2 ¶ 23 ([P]layers with a video game console . . . may create an account *limited to use on that console*, linked to their console account.”). Both means of account creation are relevant.

**Console-Linked Account Creation Process:** Plaintiff objects to the relevance of the console-linked account creation process because it refers to a process since December 2022 and five of S.S.M.’s six Epic Accounts were created before then. *See* ECF No. 51-2 ¶¶ 6, 24. The Court interprets this objection to be focused on the cabined accounts for children under the age of 13, which became available in December 2022. The Court addresses this argument below. More broadly, however, the process of creating a console-linked account is relevant because Plaintiff used video game consoles to create the accounts.

**Cabined Account Creation Process:** Paragraphs 12 through 22 and 27 through 31 describe the parent approval process for accounts belonging to children under the age of 13. These “cabined accounts” only became available in December 2022, when S.S.M. was fifteen years old. This process is not relevant because “cabined accounts” were not available to S.S.M. These paragraphs will, therefore, be stricken.

**Epic’s Terms of Service:** To the extent Plaintiff objects to Epic’s Terms of Service pre-dating November 28, 2025 (when they superseded the EULA) based on relevance, the Court agrees that the earlier Terms of Service do not form the basis of Epic’s motion to compel arbitration. *See* Pl.’s Obj. Nos. 4 & 5, ECF No. 79 at 12–13. Epic seeks to enforce the arbitration agreement contained within the EULA, not the Terms of Service pre-dating November 2025. The only Epic

Games Terms of Service attached to the declaration is the one that superseded the EULA for Fortnite accounts. Saunders Decl. Ex. 1, ECF No. 51-3. There is no evidence that S.S.M. agreed to the terms or played Fortnite after the Terms of Service took effect. Plaintiff's objection to Exhibit 1 is sustained. However, to the extent Plaintiff objects to any mention of Epic's Terms of Service, the objection is overruled. A full description of the account creation process, including the various agreements presented to account creators and users is relevant to provide a full understanding of the users' experience.

**Screenshots of the Account Creation Process:** Plaintiff challenges the screenshots depicting the account creation process as it is today. As mentioned above in the Best Evidence Rule discussion, these images are not relevant to determining what was shown on screen between 2019 and 2024 when S.S.M.'s Epic accounts were created. The Court will strike the screenshots for the additional reason that they are not relevant. *See Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 604 (3d Cir. 2020) (finding no abuse of discretion where district court excluded screenshots showing websites as they existed eighteen months after plaintiffs made reservations).

**E. Hearsay**

Hearsay statements may be considered on a summary judgment motion "if they are capable of admission at trial." *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000). Regardless, not every document or out-of-court statement is hearsay. Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted." Fed. R. Evid. 801. "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801, advisory committee's note.

Plaintiff invokes the rule against hearsay in objection numbers two through fourteen, which seek to exclude the descriptions of the account creation process, screenshots of that process, and Epic's records for S.S.M.'s Epic Accounts. The descriptions and screenshots of the account creation processes are not hearsay. They contain no factual statement that Epic seeks to prove as true. Their significance lies solely in the fact that the words or screens were shown to the account creator. *See* Fed. R. Evid. 801, advisory committee's note. To the extent certain statements like "You can now play!" in the screenshot of the console-linked account creation process, *see* ECF No. 51-6 at 9, contain some averment sought to be proven true, the Court does not take that for the truth of the matter asserted. Saunders himself describes what is required to create an Epic account based on his personal knowledge. That description is not hearsay, so the hearsay objections in Objection Numbers two through six are overruled.

However, Plaintiff's objections to Exhibits 8, 13, 18, 19, 20, and 26, and Saunders' statements about them are sustained. Pl.'s Obj. Nos. 7, 8, 9, 10, 11, and 12, ECF No. 79 at 20–35 (citing ECF No. 51-2 ¶¶ 50, 51, 53, 55, 57, 60, 61, 63, 65, 68, 69, 71, 72, 74, 75, 77, 79, 81, 83, 85, 87, 88, 89, 91, 93). Exhibits 8, 13, 18, 19, 20, and 26 are records of the EULA acceptance events for S.S.M.'s Epic Accounts.[4] Paragraph 87 of Saunders' declaration also states that Epic's records reflect S.S.M. Account #5 has been used to play Fortnite many times since this action was initiated, and Paragraph 93 asserts that Epic received no opt-out notification within 30 days of the date the EULA was first accepted. Epic offers these records (or lack thereof) and the related statements for the truth of the matter asserted: that the user of the S.S.M. Epic Accounts accepted various updated versions of the EULA at specified times on specified devices, did not timely opt out of the arbitration provision, and continued playing Fortnite after the filing of the Complaint.

[4] Plaintiff does not object to the exhibits showing the existence of the Epic Accounts or the paragraphs listing them and their creation date. *See* ECF No. 55-1 ¶¶ 47–48; Exs. 5–7, ECF Nos. 51-7, 51-8, 51-9.

Without an exception to the rule against hearsay, these statements and documents must be excluded.

Rule 803(6) allows for the admission of business records where the proponent demonstrates all of the following:

> (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). Rule 803(7), meanwhile, permits evidence that a matter is not included in a business record if:

> (A) the evidence is admitted to prove that the matter did not occur or exist;
>
> (B) a record was regularly kept for a matter of that kind; and
>
> (C) the opponent does not show that the possible source of the information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(7).

Saunders has not established the necessary elements to show these documents or statements would fall within the business records exceptions. Merely stating the documents are "true and correct EULA acceptance data from Epic's records" for each S.S.M. Epic Account is not enough to establish the foundation for the business records exception. The Court, therefore, lacks sufficient information at this stage to determine whether either exception could apply. *See MEDDICC Ltd. v. 01 Consulting LLC*, 831 F. Supp. 3d 297, 316 n.7 (E.D. Pa. 2026) (Beetlestone, J.).

Epic argues that hearsay objections in a motion to compel arbitration are generally inappropriate. ECF No. 79 at 4. However, the cases Epic relies on involve declarations that established the elements of the business records exception. *See Klosterman*, 752 F. Supp. 3d at 477 ("Further, the accompanying exhibits are admissible under Rule 803(6), as Wantuch is an authorized representative of Discover and avers that the exhibits 'are true and correct copies of the records that were made at or near the time of the occurrence of the matters set forth therein by the person with knowledge of these matters, and were made, kept by, and relied upon in the regularly conducted business activity as a regular practice of Discover.'"); *Jovel v. TeamSnap, Inc.*, No. 2025 WL 2161056, at *4 (D. Col. July 30, 2025) (finding "exhibits meet the conditions of the business records hearsay exception").

For these reasons, Plaintiff's Objection Numbers 7, 8, 9, 10, 11, and 12 are sustained on hearsay grounds.

**F. Lay Opinion**

Finally, Plaintiff objects to the statement that "the screen displaying the EULA or TOS that players are presented with is identical to the above in all material respects regardless of the platform used to install and play the game (e.g., Microsoft Xbox, Sony PlayStation, Nintendo Switch, personal computer)," asserting this is an improper lay opinion without the proper foundation establishing he personally reviewed each prior EULA/TOS display screen. Pl.'s Obj. No. 5, ECF No. 79 at 16–17 (quoting ECF No. 51-2 ¶ 35). A lay witness may testify in the form of an opinion if it is (a) rationally based on his perception, (b) helpful to determine a fact in issue, and "(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Plaintiff's objection falls within the first element, which "is the familiar requirement of first-hand knowledge or observation." Fed. R. Evid. 701, advisory committee's

note. Once again, Saunders attested that he has personal knowledge of the facts in his declaration. He is a director of product management for Epic. He may testify to opinions rationally based on his knowledge of Epic's account creation processes. *Eady*, 648 F. App'x at 190.

**III. Motion to Compel Arbitration**

Sustaining the objections listed above results in the exclusion of the screenshots of the account creation process and records of the account activity. Without that evidence, the Court cannot determine whether Epic account creators or later users were sufficiently on notice of the EULA or the arbitration agreement therein. The Court, therefore, cannot compel S.S.M. to arbitrate their claims at this time. Even if it could, however, the Court finds that S.S.M. disaffirmed the agreement and may avoid its enforcement.

The FAA, 9 U.S.C. § 1 et seq., "expresse[s] a strong federal policy in favor of resolving disputes through arbitration." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009). However, arbitration is a creature of contract, and "[a] court can compel a party to arbitrate only if the party agreed to arbitration." *Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 142 (3d Cir. 2022). The Court "consider[s] two 'gateway' questions: (1) whether the parties have a valid arbitration agreement at all (i.e., its enforceability), and (2) whether a concededly binding arbitration clause applies to a certain type of controversy (i.e., its scope)." *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 519 (3d Cir. 2019) (citation modified).

Where, as here, the arbitration agreement is not apparent on the face of the complaint, courts apply the summary judgment standard. *Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 318 n.7, 319–20 (3d Cir. 2024). The Court must view the evidence in the light most favorable to the party opposing arbitration and determine whether there is a genuine factual dispute as to the existence, enforceability, or scope of the arbitration agreement. *Id.*; *see also* Fed. R. Civ. P. 56.

Once the moving party produces sufficient evidence to show the absence of a genuine dispute as to formation, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If "the parties come forward with facts that put the formation of the arbitration agreement in issue, the court may authorize 'limited discovery' to resolve that narrow issue for purposes of deciding whether to submit the matter to arbitration." *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 406 (3d Cir. 2020). "After discovery, the court may consider the question anew," applying the summary judgment standard. *Id.* If at that point, a genuine factual dispute as to formation remains, "the court must proceed summarily to trial on the making of the arbitration agreement." *Id.* (cleaned up); 9 U.S.C. § 4 ("If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.").

In analyzing whether a valid arbitration agreement was formed, courts look to ordinary state-law principles governing contract formation. *Century Indem. Co.*, 584 F.3d at 524. Under Pennsylvania law,[5] the Court considers: "(1) whether both parties manifested an intention to be

[5] Epic relies on both Pennsylvania law and North Carolina law pursuant to the EULA's choice-of-law provision, EULA § 11. ECF No. 51-1 at 7 n.4. Plaintiff relies on Pennsylvania law. ECF No. 63 at 7 n.1. In evaluating an arbitration agreement, federal courts look to the forum state's choice of law principles. *See Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007). Under Pennsylvania law, the first inquiry is "whether the laws of the two jurisdictions would produce the same result on the particular issue presented." *White v. Sunoco, Inc.*, 870 F.3d 257, 263 (3d Cir. 2017) (cleaned up). "If the results would be the same, there is no actual conflict and [the Court] should avoid the choice-of-law question." *Id.* (cleaned up). In that event, the Court must apply the law of the forum state. *State Farm Fire & Cas. Co. v. Holmes Prods.*, 165 F. App'x 182, 185 n.1 (3d Cir. 2006).

The parties agree there is no conflict between Pennsylvania and North Carolina law. ECF No. 51-1 at 7 n.4; ECF No. 63 at 7 n.1. For questions of contract formation, each state requires a showing of mutual assent, which is generally evidenced through offer and acceptance. *Creech v. Melnik*, 495 S.E.2d 907, 912 (N.C. 1998); *Refuse Mgmt. Sys., Inc., v. Consol. Recycling & Transfer Sys.*, 671 A.2d 1140, 1146 (Pa. Super. 1996). Additionally, each state provides that a contract with a minor is voidable, not void. *See Santiago v. Philly Trampoline Park, LLC*, 291 A.3d 1213, 1224 (Pa. Super. 2023) ("A contract executed by a minor is not void *ab initio*, but is voidable such that the minor may, upon reaching majority, avoid any contract other than for necessaries."); *Chandler v. Jones*, 90 S.E. 580, 581 (N.C. 1916) ("contract of an infant is voidable and not void"). Accordingly, the Court applies Pennsylvania law.

bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 666 (3d Cir. 1998). Pennsylvania courts generally enforce electronic agreements, *Pricharda v. Checkr, Inc.*, No. 22-cv-3180, 2022 WL 16749033, at *3 (E.D. Pa. Nov. 7, 2022) (collecting cases); *see also Wiggins v. Lab'y Corp. of Am. Holdings*, No. 24-0648, 2024 WL 4476646, at *7 (E.D. Pa. Oct. 11, 2024), so long as the consumer was on inquiry or constructive notice of the agreement, *Mccormack v. Dentsply Sirona, Inc.*, No. 26-CV-2154, 2026 WL 1830935, at *4 (E.D. Pa. June 24, 2026) (Kenney, J.).

**A. S.S.M. Created the Epic Accounts.**

Although S.S.M. argues that anyone may use their Epic Account after the login information is saved, *see* ECF No. 63 at 12, that does not account for the assent to the EULA when the accounts were created. The following is undisputed:

S.S.M. has played Fortnite many times. *See* ECF No. 1 ¶ 285 (alleging "S.S.M. has played more than 581 hours of Fortnite on their Xbox console alone"). S.S.M. could not have done so without an Epic account. *See* ECF No. 51-2 ¶¶ 5, 23 (explaining that before playing Fortnite, players must set up an Epic account). When creating an Epic account, users must enter their personal information and choose a unique display name and password. ECF No. 51-2 ¶¶ 6, 9, 11, 23–24. After creating an Epic account and downloading Fortnite, players must log in using their username and password. *Id.* ¶¶ 33–34. The first time users log into their account in the Fortnite game, users must decide whether to "accept" or "decline" the EULA. *Id.* ¶ 34. Users may not play Fortnite without clicking "accept." *Id.* ¶ 32. The EULA discloses the arbitration provision on the first page. ECF Nos. 51-2 ¶ 76, 51-23 at 2 (EULA in effect when Epic Account #5 was created). It then provides the details of the arbitration provision in Section 12. ECF No. 51-23 at 11–14.

S.S.M. has created six Epic accounts to play Fortnite. ECF No. 55-1 ¶¶ 46–49. Mercado has never created a Fortnite account for herself or for S.S.M. ECF No. 63-1 ¶ 15. S.S.M. does not deny creating the Epic accounts or linking the Epic accounts to the Fortnite game after downloading it. *See* ECF No. 63-2 ¶¶ 10–14. S.S.M. is aware of others playing Fortnite on some of the accounts they have used and avers that the game saves their username and password. *Id.* S.S.M. does not deny creating or entering the username and password in the first instance, nor do they contend they have shared their username and password with anyone else. *See id.*

The undisputed evidence before the Court, therefore, shows S.S.M. created six Epic Accounts. Before playing Fortnite, S.S.M. had to log into those accounts and accept the EULA. S.S.M.'s and Mercado's declarations do not change this. Nor does the Court need to resolve any question raised by S.S.M. regarding whether one of the other people they are "aware of" playing Fortnite on "some of" their accounts could have been playing when the EULA updates were accepted after the initial log-in. Such speculation does not establish a genuine dispute that S.S.M. clicked "accept" when logging into a *new* Epic account and using it to play Fortnite for the first time. *See Tomlin v. Roblox Corp.*, No. 25-4301, 2026 WL 1412606, at *7 (E.D. Pa. May 20, 2026); *see also Antonetti v. Activision Blizzard, Inc.*, 764 F. Supp. 3d 1309, 1319–20 (N.D. Ga. 2025) (compelling arbitration where Epic identified plaintiff's account and rejecting plaintiff's argument that Epic produced insufficient evidence that the account actually belonged to him because plaintiff's refusal to confirm account credentials did "not create a 'genuine' dispute of material fact"); *Matsushita Elec. Indus. Co.*, 475 U.S. at 586 (requiring party opposing summary judgment to "do more than simply show that there is some metaphysical doubt as to the material facts").[6]

[6] Plaintiff's reliance on *Commonwealth v. Mangel* is unpersuasive. *Mangel* involved social media posts made on an account known to belong to the defendant after it was created. 181 A.3d 1154 (Pa. Super. Ct. 2018). It explained that "the proponent of social media evidence must present direct or circumstantial evidence that tends to corroborate the identity of the author of the communication in question, such as testimony from the person who sent or received the

### B. Whether the Account Creation Process Provided Sufficient Notice Cannot Be Resolved on this Record.

The inquiry does not end with a finding that S.S.M. clicked "accept" when creating the Epic Accounts. Plaintiff argues that the party seeking to compel arbitration must prove the opposing party was on actual or constructive notice of the agreement and that Epic has not done so with admissible evidence. ECF No. 63 at 13. The Court agrees.

There are different kinds of electronic agreements, the most common of which are clickwrap and browsewrap agreements. *See Mccormack*, 2026 WL 1830935, at *4, n.2. "'Clickwrap' agreements arise where a website presents the consumer with terms and conditions, often via hyperlink, and the consumer must click a box stating 'I agree' before continuing onto the site." *Id.* (citing *Duffy v. Tatum*, 354 A.3d 14, 23–24 (Pa. Super. Ct. 2026). The affirmative act of clicking "I agree" generally renders clickwrap agreements enforceable, even if the consumer never clicked on the hyperlink or read the agreement. *Id.* This is true so long as the consumer received inquiry notice of the agreement. *Id.* By contrast, "browsewrap agreements do not require users to expressly manifest assent." *James v. Global TelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017) (finding no assent where user made transaction over the phone and terms of service were on website). Instead, the terms and conditions are usually hyperlinked on the webpage, and users are said to agree merely by continuing to use it. *Id.* Browsewrap agreements require the terms or the

---

communication, or contextual clues in the communication tending to reveal the identity of the sender." *Id.* at 1162. The court affirmed the trial court's exclusion of chat messages where the Commonwealth presented no evidence tending to substantiate that the defendant created the social media account, authored the messages, or posted the photographs it sought to introduce. *Id.* at 1164. Here, there is circumstantial evidence that S.S.M. created the accounts: they were identified based on information provided by S.S.M.'s counsel, most are in S.S.M.'s name, several use the same or similar email addresses, some of the identified S.S.M. accounts have only been used by S.S.M., and notably, S.S.M. does not deny creating or using them to play Fortnite. *See* ECF No. 55-1 ¶¶ 46–47; ECF No. 63-2 ¶ 10 ("I have played Fortnite on multiple accounts. I am aware of other people playing on *some* of the accounts I have used to play Fortnite." (emphasis added)).

hyperlink to the terms be reasonably conspicuous to put the user on constructive or inquiry notice of the agreement. *Id.*

With either kind of online agreement, "a true and actual meeting of the minds is not necessary to form a contract." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009) (cleaned up). Courts look "not to inward, subjective intent but, rather, to the 'intent a reasonable person would apprehend in considering the parties' behavior." *HealthplanCRM v. AvMed, Inc.*, 458 F. Supp. 3d 308, 331–32 (W.D. Pa. 2020) (quoting *Am. Eagle Outfitters*, 584 F.3d at 582). Accordingly, "an internet user need not actually read the terms and conditions or click on a hyperlink that makes them available as long as she has notice of their existence." *Id.* at 332 (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016)); *see also Dicent v. Kaplan Univ.*, 758 F. App'x 311, 314 (3d Cir. 2019) (not precedential) (finding plaintiff's failure to read enrollment packet containing arbitration agreement "will not save her from her obligation to arbitrate"); *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983) ("In the absence of proof of fraud, failure to read the contract is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof." (cleaned up)).

Saunders describes the process of creating an Epic Games account as involving a clickwrap agreement, which is generally enforceable under Pennsylvania law. *See Wiggins v. Lab'y Corp. of Am. Holdings*, No. 24-0648, 2024 WL 4476646, at *7 (E.D. Pa. Oct. 11, 2024) (explaining clickwrap agreements are enforceable where users are clearly presented with terms and conditions before affirmatively checking a box stating "I agree" or otherwise manifesting acceptance). Plaintiff argues, however, that Epic has not established that the way the EULA was presented on screen put users, particularly the children to whom Epic markets its game, on inquiry notice.

"When analyzing whether notice is reasonably conspicuous, the court views the website from the perspective of the reasonably prudent internet user, i.e., 'a person who is neither an expert nor a novice with technology,' which 'permits certain basic, objective assumptions regarding the user's familiarity with commercial websites, hyperlinks, and online contracts.'" *Checchia v. SoLo Funds, Inc.*, 771 F. Supp. 3d 594, 607–08 (E.D. Pa. 2025); *see also Am. Eagle Outfitters*, 584 F.3d at 582 ("In assessing intent, the object of the inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior."). Thus, courts consider "both 'the context of the transaction' and visual aspects of the notice to determine whether it was reasonably conspicuous." *Checchia*, 771 F. Supp. 3d at 608 (citing Ninth Circuit case law after explaining that Pennsylvania and California law on contract formation are interchangeable).

The Court lacks sufficient evidence to determine whether the notice was reasonably conspicuous between 2019 and 2024 so as to put the account creator on inquiry notice of the agreement. This record does not establish what the creator of the S.S.M. accounts saw (or could have seen) when the accounts were created or what the user of the S.S.M. accounts may have seen when the EULA was updated.

Epic's reference to screenshots of the earlier process it filed in other cases does not help. The Court can take judicial notice of the fact that those documents were filed in other cases but cannot accept them for their truth. *See Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("Taking judicial notice of the truth of the contents of a filing from a related action could reach, and perhaps breach, the boundaries of proper judicial notice."). The Court declines to take judicial notice of the screenshots filed in other cases purporting to show the account creation process at the relevant time.

**C. S.S.M. Disaffirmed the EULA.**

Even if the Court was able to determine that users were put on sufficient notice of the EULA, it could not compel S.S.M. to arbitrate based on their acceptance of the terms because S.S.M. has disaffirmed any such agreement. Plaintiff argues the Court should not compel arbitration because S.S.M. is not competent to contract, S.S.M. disaffirmed the EULA, including the arbitration and delegation clauses, and the EULA is unconscionable. Epic argues that those questions are not for the Court to decide because the EULA delegates them to the arbitrator. Courts must enforce arbitration agreements according to their terms, including agreements to delegate questions of arbitrability to the arbitrator. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Where there is an agreement to delegate, the Court's power to resolve a dispute is limited to two circumstances: (1) when the challenge goes to the formation of the contract, or (2) when the challenge is specifically directed to the delegation clause.

"[C]hallenges to the *formation* of a contract are 'generally for courts to decide,'" *SBRMCOA, LLC v. Bayside Resort, Inc.*, 707 F.3d 267, 271 (3d Cir. 2013), because a court must compel arbitration only "upon being satisfied that the making of the agreement for arbitration . . . is not in issue." 9 U.S.C. § 4; *MZM Constr.*, 974 F.3d at 397–98 (explaining the court must "decide questions about the formation or existence of an arbitration agreement, namely the element of mutual assent"). However, "if a valid agreement exists, and if the agreement [clearly and unmistakably] delegates the arbitrability issue to an arbitrator, a court may not decide" whether a certain dispute is arbitrable. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019); *see also Zirpoli*, 48 F.4th at 138. Where the agreement contains such a clear and unmistakable delegation clause, courts must examine the plaintiff's challenge and determine whether it is specifically directed at that clause, as opposed to the arbitration agreement or contract

as a whole. *Zirpoli*, 48 F.4th at 144; *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 237 (3d Cir. 2020). If the challenge is not specifically directed at the delegation clause, the court must treat the delegation clause as enforceable and refer questions of validity or enforceability to the arbitrator. *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 227 (3d Cir. 2018). A party may challenge the delegation provision on the same legal grounds as may be raised with respect to the entire agreement. *Id.* (finding a section discussing challenge to delegation provision, identifying same defect that applied to arbitration provision as a whole, sufficient to invoke court's power to intervene); *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024) ("The severability . . . rule does not require that a party challenge *only* the arbitration or delegation provision. Rather, where a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge."). If the plaintiff specifically challenges the delegation clause, the court must determine whether that clause is enforceable. *Williams*, 965 F.3d at 237. Only if the delegation clause is unenforceable may the Court consider the questions that would have been delegated. *Id.* This is true even if the Court thinks the argument for arbitration is "wholly groundless." *Henry Schein, Inc.*, 586 U.S. at 70.

Applying these principles, the Court must first decide whether Plaintiff's disaffirmance, unconscionability, or capacity defenses either: (1) go to the making of the agreement or (2) are specific attacks on the delegation clause. *Id.*; *Zirpoli*, 48 F.4th at 144; *MZM Constr.*, 974 F.3d at 392; *see also Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 100–01 (3d Cir. 2000) (holding challenge to contract on grounds that signatory lacked authority to sign is challenge to formation, not validity, and must be decided by court). If the answer is no to both questions, the Court lacks the power to resolve the issue and must submit it to the arbitrator. The Court considers only S.S.M.'s disaffirmance because it is dispositive.

S.S.M. executed a declaration on June 3, 2026, asserting they disaffirm the EULA "and any included arbitration agreements or delegation agreements." ECF No. 63-2 ¶ 22. Whether this was an effective disaffirmance does not go to the question of formation because generally a contract with a minor may be formed and enforceable unless and until the minor disaffirms it. *Tomlin*, 2026 WL 1412606, at *9 (citing *Aetna Cas. & Sur. Co. v. Duncan*, 972 F.2d 523, 526 (3d Cir. 1992)). The Court, therefore, must determine whether Plaintiff's disaffirmance of the delegation clause itself renders the delegation clause unenforceable.

Plaintiff seeks to directly challenge the delegation clause by separating S.S.M.'s disaffirmance of the delegation clause from the disaffirmance of the arbitration provision and the EULA as a whole. The Court finds this disaffirmance of the delegation clause effective. Although a minor cannot only disaffirm parts of the contract they find unfavorable while continuing to reap the benefits of the rest, *see* Restatement (Second) of Contracts § 7; 3 Williston on Contracts § 7:14 (4th ed.); *Duncan*, 972 F.2d at 526, they may raise a challenge to the delegation clause on the same grounds that apply equally to the contract as a whole, *MacDonald*, 883 F.3d at 227. That is what S.S.M. has done.

Because S.S.M. disaffirmed the delegation clause, it is unenforceable, and the Court may consider whether S.S.M. has disaffirmed the EULA as a whole, including its arbitration provision. Once again, they have. S.S.M. submitted a declaration expressly disaffirming any agreement with Epic, including any arbitration agreement and delegation clause therein. ECF No. 63-2 ¶ 22. Epic argues S.S.M.'s disaffirmance was ineffective because they continued to use Epic Account #5 after filing the Complaint. This says nothing, however, of any activity on the Epic Accounts after filing the declaration. *Contra Tomlin*, 2026 WL 1412606, at *11–12. As a minor, S.S.M. was entitled to disaffirm the EULA and avoid its enforcement. S.S.M. has done so, and Epic has not shown the

June 2026 disaffirmance was incomplete or otherwise ineffective. For this reason, Epic's motion is denied. *See R.A. v. Epic Games, Inc.*, No. 19-1488, 2019 WL 6792801, at *7 (C.D. Cal. July 30, 2019) (finding plaintiff's declaration was valid disaffirmation where there was no evidence that he continued playing Fortnite after submitting the declaration).

**IV. Conclusion**

The Court cannot resolve the dispute as to whether S.S.M. was sufficiently on notice of the EULA on this record. Nonetheless, even if S.S.M. was on notice of the EULA and its arbitration clause, they have disaffirmed the agreement and cannot be bound by any provision therein. Epic's motion is, therefore, denied.